Filed 7/17/24  In re A.A. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | C098498 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD242279 & JD242280) |

A.M. (mother) appeals from the juvenile court's disposition order removing the minors A.A. and A.T.[1] from her custody.  (Welf. & Inst. Code, §§ 361, 395.)[2]  She argues

---

[1]    To protect their privacy, we refer to the minor children and parents by their initials. (Cal. Rules of Court, rules 8.90 and 8.401.)  Undesignated rule citations are to the California Rules of Court.

[2]    Undesignated section references are to the Welfare and Institutions Code.

the juvenile court prejudicially erred because substantial evidence does not support the juvenile court's finding that the minors would be endangered in her care, and that the juvenile court failed to inquire about reasonable efforts made to avoid removal or to consider alternatives to removal of the minors from parental custody. We will affirm the juvenile court's order.

BACKGROUND

In October 2022, the Yolo County Health and Human Services Agency (the Agency) filed section 300 petitions on behalf of A.A. (2 months old) and A.T. (5 years old) including allegations under section 300, subdivision (b)(1). The petition alleged that A.A. and A.T. were at substantial risk of harm due to mother's violent conduct and substance abuse. On October 15, 2022, mother assaulted J.A. (A.A.'s father) by throwing a glass vase at him, punching him, and hitting him with a hot frying pan. J.A. told law enforcement that mother had been drinking since the day before, was " 'drunk,' " and " 'went crazy.' " While A.T. was not at the house, A.A. was present, as were several other children ages 10 to 12, who witnessed the violent conduct. J.A. admitted to prior physical fights with mother during which the police were not called. Police detained mother, and J.A. refused an emergency protective order. The petition alleged J.A. failed to protect A.A. from the substantial risk of harm posed by mother's violent conduct and substance abuse as described above.

The petition further alleged that A.T. was at substantial risk of harm because her father, Ar. T., failed to protect her from mother's substance abuse and violent conduct. Ar. T. was aware of mother's propensity for domestic violence and substance abuse, as these issues were present in his prior relationship with mother. Mother had previously assaulted Ar. T., was physically and verbally aggressive when drinking, and drank alcohol to excess. She also had a history of drug use and overdose. A.T. told Ar. T. that mother fights with J.A., and mother also yells at her.

2

*The Detention Report*

The Agency's detention report filed on October 21, 2022, elaborated on the October 15, 2022 incident (the October incident) and the investigation that followed. On October 15, 2022, the Agency received a referral for general neglect and emotional abuse presumably because police had been called to respond to a violent domestic dispute. The referral noted that mother suspected J.A. had been unfaithful because of something on his cell phone. The couple argued, and mother punched, slapped, and hit J.A. with a hot frying pan. J.A. grabbed mother and pushed her to the ground. Police responded, found mother was the aggressor, and detained her.

J.A. told the social worker that mother had been drinking hard alcohol since the night before, but denied she had a problem with alcohol or drugs. L.A. (A.A.'s 12-year-old half-sister), Al. M. (A.A.'s 11-year-old cousin), Ad. A. (A.A.'s 10-year-old half-brother) (collectively, the other children), and A.A. (age two months) were at home that day. Only A.A. regularly lived there. The other children were visiting. While J.A. told the Agency that A.A. had been in her bedroom asleep during the incident, L.A. told law enforcement that A.A. had been in the living room during the fight, and "we" grabbed A.A. and took her to a bedroom " 'once thing[s] settled down.' " J.A. told police mother had assaulted him with a glass vase and hot frying pan. The other children told police they saw mother hit, punch, and slap J.A. They also saw J.A. grab mother by the neck and throw her to the ground. J.A. told the police he and mother had physical fights before, but the police had never been called.

The maternal grandmother, Linda M., arrived on the scene after which J.A. refused further interview attempts and left to take two of the other children to their mother's home. The Agency social worker asked J.A. to return promptly. She waited nearly two hours, but J.A. did not return to the scene or return subsequent phone calls.

The Agency also attempted to speak with mother on the evening of the October incident to complete the investigation and form a safety plan, but mother was combative,

3

refused to be interviewed, and hung up the phone after informing the Agency social worker that she would deal with the issue later. Attempts to interview mother, J.A., and the other children in person the next day were unsuccessful because the individuals encountered refused to identify themselves. A social worker eventually spoke with mother on the phone on October 16, 2022, and attempted to explain the investigation process and purpose of a safety plan; however, mother repeatedly interrupted and berated the social worker, who eventually ended the call.

A protective custody warrant was obtained for A.A. on October 16, 2022, because of the high risk of abuse given mother's volatile and violent conduct and the parents' refusal to cooperate in the investigation process. Also on October 16, 2022, and contrary to J.A.'s report that only A.A. lived with mother and J.A., the Agency learned from the maternal grandmother that mother had another daughter, A.T. (age five), who was not home the day of the October incident, but who would return home the next day. Maternal grandmother also told the Agency about mother's 15-year-old son An. M. who lived with his father. The Agency's attempts to contact mother and J.A. in person and via telephone on October 16 and October 17 were unsuccessful, and on October 17, 2022, the Agency obtained a protective custody warrant for A.T.

Mother, while defensive and minimizing, initially agreed to meet with the Agency on October 18, 2022, to create a safety plan; however, mother cancelled that appointment after the Agency spoke with the father of An. M. (mother's teenage child) to complete a safety assessment for that child. The initial attempt to execute the protective custody warrants for A.A. and A.T. this same day failed because mother refused to disclose the minors' location; however, mother surrendered the minors the next day, and they were placed with the maternal grandmother.

On October 20, 2022, the Agency spoke with A.T.'s father Ar. T. who relayed that mother had contacted him and other relatives and told them to say there were no concerns and that A.T. was fine. Ar. T. had concerns because there had been domestic violence in

4

his relationship with mother, and mother also abused alcohol and had a history of drug abuse. Ar. T. worried mother was verbally abusive to A.T., and A.T. told him that mother and J.A. fight all the time. Mother only allowed Ar. T. contact with A.T. in exchange for money. Ar. T. had not filed for custody of A.T. because he did not have steady employment or a place to live.

The Agency's attempt to speak with J.A. on October 20, 2022, failed because the phone number he provided the day before was out of service. The social worker did speak with mother who denied having any substance abuse problems, but admitted to postpartum depression and anxiety, which she stated were the cause of the "anger outburst on October 15, 2022." Mother denied the minors were ever in any danger and said she intended to stay in her relationship with J.A., who had agreed to support her through her mental health/postpartum challenges.

Mother had an extensive history of referrals in Sacramento County, one of which was substantiated when mother's then 12-year-old son An. M. found mother unresponsive and foaming at her nose (the minor A.T. was then two years old). She was taken to the hospital and tested positive for opiates, cocaine, and alcohol. Other substantiated reports showed mother's history of relationships with domestic violence. Mother's criminal history check reflected multiple driving under the influence (DUI) convictions (starting in 2008) and her successful completion of a drug court program, among other things. Copies of police reports underlying the October incident were attached to the detention report.

*The Detention Hearing*

On October 24, 2022, the minors were detained pending jurisdiction and remained placed in the maternal grandmother's home. Mother was ordered to substance test prior to breastfeeding, and each parent would receive three hours of visits weekly with the discretion to increase to six hours weekly as soon as possible given A.A.'s age. Maternal grandmother requested breastfeeding visits occur at her home rather than in Woodland,

and the juvenile court asked the Agency to work with her to obtain approval to supervise those visits.

*The Agency's Jurisdiction Report*

According to the social worker, on November 1, 2022, mother denied the allegations in the petition, claiming the alcohol and drug abuse had not been documented and that she was never tested. She admitted to the social worker that she had three glasses of wine the night before and one mimosa the morning of the October incident and claimed she was upset because of her postpartum depression, A.A.'s difficulty latching, and her body dysmorphia. Mother stated, " 'It was my explosive time. Alcohol shouldn't have played a role.' " Mother minimized her behavior, stating she only tried to hit J.A. with a pan, and it was not hot. She admitted accidentally burning herself with a hot pan during the incident (although she did not explain how) and denied throwing a vase or hitting J.A. Mother maintained that the children who were present that day were not negatively impacted by what had happened. Mother also denied that she had previously overdosed on drugs, claiming instead that she had traces of pills in her system from the day before, but that she had actually been suffering from pneumonia. Mother was still in a relationship with J.A. The Agency's attempts to interview both Ar. T. and J.A. were unsuccessful.

*The Jurisdiction Hearings*

On November 28, 2022, mother submitted on jurisdiction as to both children, but requested visitation be increased to six hours for breastfeeding. Ar. T. did not attend the hearing. Thereafter, the juvenile court sustained the allegations concerning A.T. and found jurisdiction. Jurisdiction over A.A. was continued to allow J.A. to confer with his court appointed attorney.

On December 12, 2022, mother and J.A. submitted on jurisdiction for A.A. and requested the case be transferred to Sacramento County for disposition. The juvenile

court sustained the allegations concerning A.A., assumed jurisdiction, and set the matter for a transfer-in hearing in Sacramento County for both minors.

*The Transfer to Sacramento County, Department Reports, and Hearings Prior to Disposition*

On January 4, 2023, the Sacramento County Juvenile Court accepted the transfer-in, appointed mother and J.A. counsel, and set the disposition hearing for January 25, 2023. Mother also informed the juvenile court that the minors might have Hopi ancestry out of Arizona or Texas through her cousin, and the juvenile court set the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) compliance hearing to coincide with the disposition hearing. Ar. T. did not appear.

As summarized in the Sacramento County Department of Children and Family Services (the Department) transfer-in disposition report, the Department spoke with mother on January 20, 2023, and she confirmed she lived in Elk Grove. Mother was still in a relationship with J.A. and wanted to be an "intact family," but J.A. lived elsewhere. Mother complained about the Agency's investigation, her prior representation, and asserted there had been miscommunication concerning the incident leading to the petition. Nonetheless, mother expressed a willingness to participate in services and relayed that she had voluntarily tested negative for substances in Yolo County. The Department attempted, but was unable to interview either J.A. or Ar. T. A.T. reported she missed mother and J.A. and denied that they fought in front of her. A.T. loved mother and wanted to be reunited with her. A.T. and A.A. remained placed with maternal grandmother, who was willing to adopt them if reunification failed. Maternal grandmother supervised approximately nine hours of visitation with mother weekly. J.A. visited less frequently and often electronically.

The Department recommended the juvenile court adjudicate the minors as dependents and order them removed from mother's care. As relevant to mother's arguments on appeal, the disposition report highlighted that the evidence from the

7

disposition report and detention report established that services were not available to maintain the minors in parents' care. Accordingly, the Department recommended mother's reunification services include a domestic violence program, parenting education program, and substance abuse services (including an assessment, testing, a 12-step program, and substance abuse treatment as needed).

The January 2023 disposition hearing was continued several times to allow J.A. to confer with his attorney and because mother objected to the Department's removal recommendation resulting in a contested disposition hearing on April 5, 2023.

At the pretrial hearing on March 22, 2023, the Department informed the juvenile court that maternal grandmother was no longer allowed to supervise visits with mother because mother hit A.T. with a wooden back scratcher in a bathroom during a visit that maternal grandmother was not actively supervising. The loss of maternal grandmother as a visit supervisor complicated mother's ability to visit as the Department had limited availability to supervise the visits. The minors' counsel identified the upcoming child family team (CFT) meeting and hoped everyone could attend it to work out the visitation issues. The court reiterated the importance of the CFT meeting so that everyone could cooperate to work out a better visitation plan. Mother also claimed she did not understand what was required of her for the substance abuse treatment, that the Department social worker was not being helpful, and that she was not timely receiving referrals for services.

On March 28, 2023, the Department filed an addendum to the disposition report relaying more information concerning the wooden back scratcher incident. On March 3, 2023, A.T. told a school employee that mother spanked her with a stick. The investigation that followed revealed that maternal grandmother did not actively supervise visits with mother and had allowed mother and the minors to be outside of her view while maternal grandmother sat and worked at the kitchen table. Maternal grandmother told the social worker that mother took a wooden back scratcher and used it to hit A.T. while

mother and A.T. were in the bathroom.[3] As a result, mother's visits were changed to Department-supervised. On March 24, 2023, mother failed to appear for the scheduled CFT meeting. Mother's explanation for not attending was inconsistent, with her asserting both that the CFT conflicted with other services and that she had experienced technical issues preventing her from signing on to the meeting. Notably, the Department attempted to contact mother by phone numerous times during the CFT meeting, but mother failed to answer her phone, which mother later stated was not accepting calls.

Regarding mother's predisposition services, the Department confirmed mother's services were in place, and those services had been discussed with her several times. Mother had started the Specialized Treatment Recovery Services (STARS) program, but the program reported that mother "had been giving her STARS worker issues." On March 27, 2023, two Department social workers attempted to speak with mother about her services, but mother continually interrupted to complain about the visitation time she had been assigned, even after it was explained they were attempting to obtain a different time slot, but none were then available. Also on March 27, 2023, mother's assigned recovery specialist with the Bridges, Inc. program told the Department mother had been accepted into the program, but she appeared to be intentionally creating confusion between the treatment staff and the Department. Nonetheless, mother had been repeatedly instructed on how to comply with this program.

On April 4, 2023, the Department filed a trial brief arguing the juvenile court should order the minors removed from mother's custody and their placement in maternal grandmother's care should continue. The minors were detained because of domestic violence and mother's substance abuse; however, these issues had not been resolved. Mother continued in her relationship with J.A. and had made minimal progress in her

---

[3] How maternal grandmother knew this is unclear given that she was not actively supervising the visit.

substance abuse treatment. Mother was argumentative with her service providers and intentionally caused confusion between the providers and the Department. Finally, mother had recently used corporal punishment during a visit, hitting A.T. (five years old) with a wooden back scratcher. Accordingly, the Department maintained that returning the minors to mother "would create a substantial risk of physical harm, abuse or neglect and there are no services available that would ensure the children's safety" in the mother's home.

Finally, the Department's addendum report filed on April 5, 2023, relayed that mother was engaging in substance abuse testing, had recently completed parenting classes, and was attending a domestic violence program; however, significant concerns remained. Mother and maternal grandmother had not been cooperating with Department-supervised visits, and the Department had repeatedly told maternal grandmother not to allow mother in the home. Nonetheless, the Department had learned that mother visited the minors at maternal grandmother's home when maternal grandmother was absent, and an unknown male was caring for the children.

*The Contested Disposition Hearing*

At the contested dispositional hearing on April 5, 2023, the juvenile court denied mother's untimely request to have maternal grandmother testify, highlighting the specific issue being contested was whether the minors should be removed from mother's care. The Department and the minors' attorney then submitted the matter on the reports and addendums. Mother's attorney argued that mother was fully engaged in her services and thus the minors could be safely maintained in mother's home under the supervision of the Department. Neither J.A., nor Ar. T. attended this hearing, but J.A was represented by his court-appointed counsel.

In support of mother's request that the minors not be removed from her care, she testified, denying there was any evidence she had used drugs and the only evidence she used alcohol was her own admission. Mother denied she had an alcohol abuse problem

and blamed the domestic violence on her "postpartum issue" for which she had since received care. She had been testing in Yolo County twice weekly prior to visits. Mother complained the Department did not initially continue her testing regimen after the case transfer, but that she had been testing regularly for about six weeks and had only had one positive test. She was tested randomly three times a week through two different programs. Her confusion with her substance abuse program came from the Department. She had not yet started substance abuse counseling.

Regarding her domestic violence services, mother testified she did not have those services prior to transfer because "Yolo" had told her she would transfer "and have [her] time to fight the case." Mother also believed those services were unnecessary because the domestic violence prosecution was "thrown out" of court. She was still in a relationship with J.A. (who lived with her on and off) and had attended two weeks of domestic violence classes. Mother denied that there was ever a time that she was not willing to participate in safety planning with the Agency in Yolo County. She also denied hitting A.T. with the wooden back scratcher and said the referral had been closed as unfounded. Mother disagreed with the Department's recommendation and believed removal was not in the minors' best interest and that she had done what was asked of her.

On cross-examination, mother denied the maternal grandmother had failed to supervise visits. Mother denied she had a problem with alcohol, although she admitted drinking the morning of the domestic violence incident. She also only recalled portions of what had happened that day; for example, she recalled hitting J.A. with a vase, but not striking him with a frying pan. Mother testified she and J.A. were co-parents, but no longer had a sexual relationship. She conceded it was not healthy for children to see domestic violence but maintained that her child was not present when it happened. Mother nevertheless conceded what had happened was domestic violence.

Thereafter, the Department argued that the evidence had established the minors had to be removed from mother's care and that there were no services available to ensure

their safety if they lived with her. The minors' attorney also asked the juvenile court to follow the Department's recommendations. In contrast, mother argued she had engaged in six months of services, was suffering from postpartum depression when the October incident occurred, had cooperated with authorities, and asked that the minors be returned to her under supervision with a safety plan.

Prior to ruling on disposition, the juvenile court determined that there was still a reason to believe that the minors might be Indian children under the ICWA because the response from the Hopi tribe was still outstanding and that another ICWA compliance hearing would be needed. The juvenile court then found by clear and convincing evidence that there was a "substantial danger" to A.A. and A.T.'s "physical health, safety, protection, physical or emotional well-being, or that there would be if the [minors] were returned home to the parents' care at this time, and there are no reasonable means by which the [minors'] physical and/or emotional health can be protected without removing the [minors] from the physical custody of the parents [mother and J.A.], with whom the [minors] resided at the time the petition was initiated." Further, the Department had complied by "making reasonable efforts to return the [minors] safely to the home of the parent;" however, "[t]he extent and progress made by the mother toward alleviating or mitigating the causes necessitating placement [had] been fair." While mother had engaged in some services, "there [was] little accountability for the reasons that brought the [minors] before the Court, and also some selective recognition." Accordingly, the juvenile court adopted the proposed findings and orders, removing the minors from mother's custody, adjudging them dependents, and ordering reunification services for mother and J.A.[4] Mother timely appealed.

---

[4] Presumably in light of Ar. T.'s absence from the case, the juvenile court found Ar. T. would not be allowed to visit A.T. as the alleged father until he came forward and established paternity.

12

DISCUSSION

Mother challenges the juvenile court's order removing the minors from her care at the disposition hearing, arguing that: (1) substantial evidence does not support the juvenile court's finding that the minors would be endangered in her care; and (2) the order must be reversed for the juvenile court's failure to inquire about reasonable efforts made to avoid removal or consider alternatives to removal of the minors from parental custody. We reject both contentions.

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B*. (2018) 26 Cal.App.5th 320, 332; accord, *In re I.R*. (2021) 61 Cal.App.5th 510, 520.) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

13

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462 [applying § 361, subd. (c) within the context of a § 387 removal].) When reviewing removal findings, " '[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings based on the clear and convincing evidence standard.' " (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239-1240, italics omitted; see *Conservatorship of O.B.* (2020) 9 Cal. 5th 989, 1004-1005.) Put simply, we must evaluate whether there is substantial evidence from which a reasonable trier of fact could have found the need to remove the minors was highly probable. (*In re L.V.* (2020) 54 Cal.App.5th 147, 149, 156-157.)

Here, mother challenges the juvenile court's determinations that there was a substantial danger to the minors or would be if the minors were returned to mother's care and that there were "no reasonable means by which the [minors'] physical and/or emotional health [could] be protected without removing" them. Mother asserts the juvenile court failed to consider whether there were facts supporting these determinations, and posits that had the juvenile court done so, it would have determined removal was not required. We disagree.

The only disputed issue at the disposition hearing was whether removal would be required or whether the minors would be returned to mother with family maintenance services. Accordingly, there was extensive evidence (by way of reports and testimony), as well as argument (both oral and written) concerning these issues.

Starting with the referral resulting in this dependency case, the October incident demonstrated that mother suffered from both substance abuse and domestic violence problems. Mother had been drinking since the night before, even though she was

14

breastfeeding two-month-old A.A.[5]  She became enraged at J.A.'s alleged infidelity, threw a glass vase at him, slapped and hit him, and then hit him with a hot frying pan.  In response, he threw her to the ground.  Some, if not all of these actions, were witnessed by multiple children in the home, where A.A. was also present.[6]  Both mother and J.A. sustained burns and bruising as a result of the incident.  Responding authorities noted mother's intoxicated state, including her slurred speech, and determined she was the "primary aggressor," resulting in her detention and transportation to jail.

Further, while A.T. was not in the home on the day of the October incident, she had previously reported that mother and J.A. "argue and yell all the time," and her father worried that mother yells and curses at A.T.  Moreover, J.A. admitted to other instances of domestic violence with mother, mother was the aggressor in domestic violence in her prior relationship with Ar. T., and mother's referral history showed other relationships with verified domestic violence.  Mother was in a co-parenting relationship with J.A., and he still lived with her on and off.  Thus, it is clear that A.T. was at risk of harm from the domestic violence despite not having witnessed the October incident.  (*In re T.W., supra*, 214 Cal.App.4th at p. 1163.)

In addition, while mother blamed the October incident on her postpartum depression, the record supports that mother had been abusing alcohol and other substances since long before A.A.'s birth.  For example, mother's criminal history check and prior child abuse referrals showed multiple DUI convictions (starting in 2008) and that in 2019 she had been found unresponsive foaming at the nose by mother's then 12-

---

[5]     The record does not reflect whether mother utilized alternative feeding sources when consuming alcohol but does show she was required to test prior to visits to ensure that A.A. was not exposed to alcohol through breastfeeding.

[6]     Mother's argument that A.A. was asleep in a bedroom ignores the contrary evidence in the record that A.A. was in the living room during the domestic violence and was only removed by the children after the fight calmed down.

year-old son (the minor A.T. was then two years old) and on that occasion was determined to be under the influence of opiates, cocaine, and alcohol. Mother's substance abuse was further confirmed by J.A.[7] and Ar. T.

Moreover, the juvenile court's determinations: (1) that the Department had made reasonable efforts to facilitate the return of the minors to mother, but mother had only made fair progress toward alleviating or mitigating the causes necessitating the minors' detention; and (2) that while mother had engaged in some services, she refused to acknowledge the problems that led to the court intervention and suffered from "selective recollection" are supported by substantial evidence.

Mother continued to deny and minimize her domestic violence and substance abuse issues, missed a critical CFT meeting, and intentionally created confusion with her service providers and the Department. This denial increased the risk of reoccurrence. (*In re V.L., supra*, 54 Cal.App.5th at p. 156.) Further, despite mother's protestations otherwise, her refusal to develop a safety plan to keep the minors safe in her care began immediately after the October incident and was well-documented in the detention report. These behaviors meant the minors could not be safely maintained in her home with services. This was especially true in light of the recent corporal punishment of A.T. by mother in maternal grandmother's home during what was supposed to be a supervised visit.

Accordingly, we find there is substantial evidence to support the juvenile court's finding that there was a "substantial danger" to A.A. and A.T.'s "physical health, safety, protection, physical or emotional well-being, or that there would be if the [minors] were

---

[7] While J.A. denied that mother had an alcohol abuse problem, he told responding authorities that mother had been up drinking hard alcohol since the night before on the day of the referring incident and was still drinking that morning. Thus, the information relayed by J.A. supports that mother abused alcohol.

returned home to the parents' care at this time." We also conclude the record does not support mother's contention that the juvenile court did not adequately determine whether reasonable efforts were made to prevent and eliminate the need for removal of the minors or consider reasonable alternatives to removal. (§ 361, subd. (c)(1) & (e).)

Mother's contention that reasonable alternatives to removal were not considered is not only unsupported by the record, but also disingenuous. The only disputed issue at the disposition hearing, which was supported by extensive evidence and argument, was whether removal would be required or whether the minors would be returned to mother with family maintenance services. Mother's proposed alternative to removal—that the minors be returned to her care with a safety plan, intensive supervision, and random home visits—was argued, considered, and rejected as insufficient to ensure the safety of the minors.

Mother's contention that there was no inquiry into available services that would eliminate the need for further detention is equally disingenuous. As the Department's reports reflected, the Agency and Department provided mother with services to address the reasons for removal—and mother even participated in some. And, as the Department reported and the juvenile court found, mother did not make enough progress in those services to ensure the minors' safety in her home.

*In re Ashly F.* (2014) 225 Cal.App.4th 803, upon which mother relies, does not support mother's contentions of error. In *Ashly F.*, the appellate court reversed a disposition order for lack of substantial evidence because the record included no discussion of reasonable efforts by the agency. (*Id.* at p. 809.) The mother had physically abused her children but, following the detention hearing, she moved out of the family home where the father and children remained. (*Id.* at pp. 806–807.) The agency's report had merely stated there were no " 'reasonable means' " by which the children could be protected without removal and that " 'reasonable efforts' " were made to avoid removal, without explaining what efforts were made or services were provided. (*Id.* at p. 808.)

17

Although the juvenile court was required to "consider, as a reasonable means to protect the minor, . . . [t]he option of removing an offending parent . . . from the home," (§ 361, subd. (c)(1)), it made no inquiry into the " 'reasonable efforts' " by the agency, and its order simply parroted the agency's assertion it made reasonable efforts to avoid removal. (*In re Ashly F., supra*, at p. 808.)  The appellate court noted that the mother had already left the family home and father had completed parenting classes and, therefore, the juvenile court could have found that the agency could adequately protect the children by making unannounced home visits.  (*In re Ashly F.,* at p. 810.)  Yet, nothing in the record showed that the juvenile court considered this option.  (*Ibid.*)

Here, unlike *In re Ashly F.*, the Department *did* provide an explanation of the services it was providing to address mother's domestic violence and substance abuse issues, and the juvenile court *did* receive evidence of the efforts made by the Department. Mother argued for placement with her with maintenance services, and the juvenile court clearly considered and rejected that alternative, finding mother's progress had been only fair, and she was not accepting accountability, which placed the minors at risk. Placement with mother with maintenance services is the only identified reasonable alternative to removal from parental custody in this case.  Unlike *In re Ashly F.*, the juvenile court here did not have another parent with whom to place the minors at disposition in order to avoid removal.  In sum, *In re Ashly F.*, is inapposite.

Nor does mother's reliance on rules 5.690(a)(1)(B)(i) and 5.678(c)(2) benefit her. Rule 5.690(a)(1)(B)(i) requires, in pertinent part, that the Department prepare a social study of the child that must include, in the case of the recommendation of removal of the child, "[a] discussion of the reasonable efforts made to prevent or eliminate removal. . . ." As we have recounted, the Department's disposition report highlighted that evidence from that report and the detention report established that services were not available to maintain the minors in parental care, thus complying with rule 5.690(a)(1)(B)(i).

18

Finally, rule 5.678(c)(2), which requires specified findings where "it is known or there is reason to know the child is an Indian child," was wholly inapplicable to this case, as there was no finding in this matter that the minors were known to be Indian children within the ICWA. To the extent mother's citation to rule 5.678(c)(2) neglected to account for the amendment to that rule effective January 1, 2020—the requirement that the juvenile court determine whether other services would prevent the need for removal— (which is now found in rule 5.678(c)(3)), we have already concluded that requirement was met here.

## DISPOSITION

The judgment is affirmed.

_____\s_____,
Krause, J.

We concur:

_____\s_____,
Earl, P. J.

_____\s_____,
Duarte, J.